CakuthbRS, J.,
delivered the opinion of tbe Court.
This was an action on the case, with one. count in trover and another- in case, brought against the defendants in White Circuit Court, to recover damages for killing their negro man slave, Austin. The verdict and judgment were in favor of the plaintiffs for one cent damages, and they' bring up the case by appeal in error.
The Court permitted the defendants to prove the character of the slave to be bad, and to give their opinions that he was of no value on account of his-infamy. Most of them stated that they had never seen or known him until he was apprehended for rape and murder, and put into the jail at Sparta; and in view of that charge hanging over him, they considered him, worth nothing. Objections to all this evidence were overruled, and it was permitted to go to the jury. This,, •we think, was clearly erroneous. It is easy to see, in a. case like this, what a powerful effect such proof would-have upon the minds of a jury.
The case was one of extraordinary aggravation, in. which all law was set at defiance, public justice insulted, and the life of a human being, already in manacles, lawlessly destroyed.' He was charged with the shocking crimes of rape and murder combined. But the officers of justice had performed their’ duty, and had him safely incarcerated in jail to- await the vengeance of the law, in case his guilt was established according to its forms. There was not the least necessity that the defendants should interfere after the criminal had been secured and disarmed of all power of resistance or of’ flight, and shed human blood, even of a slave, without *338 trial or condemnation. If the slave was guilty of the crimes imputed, no punishment would have been too severe for him, and so by the law the penalty is death — death by hanging — the mode adopted by the defendants without and against law. But no man, whether bond or free, is to be condemned or punished without a hearing — a fair and impartial trial. There is neither valor nor patriotism in deeds like these. Not valor, because there is no contest — the victim is already in bonds and harmless; nor patriotism, because the country has provided for the proper and legal punishment of offenders, and needs not the aid of mobs and lawless combinations to wield the sword of justice or quicken its stroke. No matter how great the malefactor may be, whose life is thus taken without law, a feeling of alarm and insecurity pervades the whole community when one of these shocking deeds of violence is perpetrated. No man can tell what unfortunate concurrence of circumstances may raise the storm of popular fury against him, though he may be innocent, and bring speedy destruction upon him, if these examples are to be tolerated. All good citizens, every one who values his own safety, or has any regard for law and order, should unite in rebuking, in all proper modes, these outrages upon the lives of men and obstructions of the course of law and justice. The courts and juries, public officers and citizens, should set their faces like flint against popular outbreaks and mobs in all their forms.
This slave was well secured in jail to abide his trial and answer -the demands of justice against him, even with his life. There was no chance for escape.
Some of the defendants by written agreement to *339 stand by each other, and others without haying signed it, moved by concert to the jail, broke down the door, took out the negro, and hung him till he was dead. It may be that he was guilty, but that was no good reason why others should bring the blood of murder upon themselves, by taking life without authority of law, and in contempt of public justice. If he were guilty of the enormous crimes charged against him, if was not then made manifest by a trial, and his guilt had not been established. The presumption of innocepce can only be removed by proof upon a legal trial. It must be taken, then, for the purposes of this suit, that no crime had been committed by the victim of this wanton outrage. The jury should have been so instructed, and no proof of character, based upon this charge, should have been admitted. This would involve the necessity of trying the truth of all such charges to ascertain what weight should be given, to the opinion. It is easy to see that this mode of ascertaining damages from the value of the slave, based upon character, with reference to the truth of the charge, would always -make a case of nominal damages in cases of this kind. Witnesses would readily say, that as the slave was guilty of murder, and confined in jail to be hung for it, he was of no value. That is not the rule in such a case. His value should be determined from age, appearance, health, and, with all these, what he would sell for- in the market; not what A, B, or C would give for him, or what he was worth if the charge were true. They recklessly slew him, and his guilt can never be legally made out. This misguided zeal to avenge the wrongs of others has deprived society of an example to deter evil men from *340 crime, and presented an example of all others the most alarming to any well ordered community.
The general moral traits of character, as well as physical condition, would constitute elements in the estimation of value, but without reference to the accusation upon which he had not been tried, and as to which the law presumed his innocence until the contrary was made legally to appear. It was not for the defendants to adjudge that question, nor for witnesses to form and give their opinions as to his value upon the supposition of his guilt.
We think his honor also erred in holding that this was not a case in which the jury might go beyond the actual value, and give exemplary' and vindictive damages. It was a deliberate, premeditated, and violent destruction of the plaintiff’s property, in disregard of both the civil and criminal laws of the State, and of most evil example. It is just the kind of case in which the jury ought to have been allowed to vindicate the law by going beyond the value, and giving exemplary damages. In the case of Johnson v. Perry, 2 Hum., 569, where the action was, like this, for an injury to a slave, the Court says, “ the jui’y may give smart money as a punishment for aggravated circumstances attending the wrong.”
In Tillotson v. Cheetham, 3 J. R., 56-64, which was an action for heating a horse to death, it was held, that as it was a case of “wantonness and cruelty, the jury had a right to give smart money.'” This was the charge of the Circuit Judge, and the Supreme Court said it was correct, and that they would have- been, better satisfied with the verdict if it had been more exemplary. The Supreme Court of Connecticut (10 *341 Conn., 384) bold, that for injuries to personal property, “ the jury is not restricted to the pecuniary loss of the plaintiff.” These cases, and many others, are cited in Sedgwick on Damages, 454, 464. The reason of this rule is, that, in aggravated cases, the damages should be such as not only to remunerate plaintiff, but to operate as a punishment of ^defendant, and an example to deter others from lilse offences. This principle is every where regarded as one of most salutary influence in the administration of justice, tending to prevent wrongs by the double operation of punishment and example.
The plaintiffs proved their title to this slave, and that he was killed by the defendants, and should have recovered his market value, at least. The verdict was a mockery of justice.
The judgment will be reversed, and a new trial granted.